UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SHIRLEY MINTER-SMITH                                                                     PLAINTIFF

V.                                                              CIVIL ACTION NO. 3:03CV1057-DPJ-JCS

MICHAEL B. MUKASEY, ATTORNEY GENERAL                                   DEFENDANT


**ORDER**

      This employment discrimination case is before the Court on the following post-trial

motions: Defendant's motion for judgment as a matter of law [172]; Defendant's motion for new

trial [173]; Defendant's motion for remittitur [174]; and Plaintiff's motion for attorneys' fees and

costs [178].  Having fully considered the parties' submissions and the applicable law, the Court

finds that Defendant's motions 172 and 173 should be denied; that Defendant's motion 174

should be granted; and that Plaintiff is entitled to fees and costs as provided herein.

**I.        Facts and Procedural History**

      Plaintiff Shirley Minter-Smith is a former employee of the Federal Bureau of Prisons

("BOP") who last worked at the Federal Correctional Institution in Yazoo City, Mississippi

("FCI Yazoo City").  Plaintiff claims that she was an outspoken critic of the warden and the

racial climate at FCI Yazoo City, and that Defendant discriminated against her for expressing

these concerns and for filing two EEO complaints.  According to Minter-Smith, Warden Khrusid

Yusuff and her assistant wardens black-balled Plaintiff's efforts to seek employment in other

BOP facilities, causing her non-selection as to four of the many positions she sought.  Plaintiff

further claims that she was constructively discharged from her employment on January 2, 2004.

Plaintiff filed the instant suit alleging retaliation under Title VII of the Civil Rights Act of 1964, as amended. After hearing five days of testimony, the jury found unlawful retaliation and returned a verdict for Minter-Smith. The jury specifically found that but for retaliation, Minter-Smith would have been selected for two of the four disputed job vacancies, namely an Assistant Correctional Program Administrator position (Vacancy No. 02-KC-39) and a General Training Instructor position (Vacancy No. 02-GLN-01). The jury rejected Minter-Smith's claim as to two other disputed positions. Finally, the jury concluded that Minter-Smith was constructively discharged and awarded her $300,000 for emotional distress. This Court thereafter awarded economic damages in a subsequent proceeding.

## II.     Analysis

Defendant has now moved for judgment as a matter of law ("JMOL") pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. Alternatively, Defendant seeks a new trial or remittitur of damages under Rule 59.

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 149 (2000) (citing FED. R. CIV. P. 50(a)) (other citations omitted). The trial court must "review all of the evidence in the record . . . . In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. at 150 (citations omitted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151 (citation omitted). The court "'will not disturb the jury's verdict

unless, considering the evidence in the light most favorable to [the plaintiff], the facts and inferences point so overwhelmingly to [the defendant] that reasonable jurors could not have arrived at a verdict except in [its] favor.'" *Streber v. Hunter*, 221 F.3d 701, 721 (5th Cir. 2000) (quoting *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369 (5th Cir. 1998)).

Defendant alternatively seeks a new trial under Rule 59 of the Federal Rules of Civil Procedure. Rule 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). The rule does not delineate the necessary grounds to support such an order, stating only that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). Here, Defendant asserts that the verdict of liability is against the weight of the evidence and that the damages award is excessive. "In making a determination that the verdict is against the weight of the evidence, the court weighs all the evidence and need not view it in the light most favorable to the nonmoving party." *Beckham v. La. Dock Co.*, 124 F. App'x 268, 270 (5th Cir. 2005) (citing *Smith*, 773 F.3d at 613). However, "[a] motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Id.* (citing *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838-39 (5th Cir. 2004)).

A.     Retaliation

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful

3

employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a). "There are three elements to a *prima facie* case of retaliation under Title VII:  (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002).

Minter-Smith claims that after she challenged racial issues at FCI Yazoo City, Warden Yusuff and her assistant wardens, primarily Assistant Warden ("AW") James Mitchell, retaliated in various ways, including efforts to block Plaintiff's applications for employment within the BOP.  To understand this claim, it is necessary to understand the application process.  When a BOP position is posted, a list of the best qualified applicants is prepared.  From that list, a decision-maker, or someone acting on his or her behalf, calls references to obtain vouchers (*i.e.*, recommendations) for the applicant.  According to at least one defense witness, the vouchers have a "great" or "significant" impact on the hiring decisions.  Plaintiff  unsuccessfully applied for dozens of jobs within the BOP, but she claims that four of her applications were denied due to negative vouchers from FCI Yazoo City.  She further asserts that the negative vouchers were given in retaliation for her protected activities.  The jury agreed and found that but for unlawful retaliation, Minter-Smith would have received two of the four disputed positions.

Defendant argues that Minter-Smith "failed to present evidence demonstrating a causal connection between her prior activity and the non-selections for" the two positions the jury found that she would have received but for retaliation.  Defendant's Motion for JMOL at 17.

4

Defendant initially claims that there is no proof connecting any discriminatory intent to the vouchers.  Ample evidence supports the jury's verdict on this issue.

First, Plaintiff introduced the Final Agency Decision on Plaintiff's EEO complaint ("Final Agency Decision"), issued by the Department of Justice, Complaint Adjudication Office. That decision concluded, "BOP retaliated against complainant in violation of Title VII . . . when Warden Yusuff and AW Mitchell provided negative employment references to various recommending officials in 2002."  (Ex. P-19 at 15.)  Significantly, the Final Agency Decision admitted that Defendant retaliated against Plaintiff with respect to all four hiring decisions presented to the jury; the jury agreed as to two.

Second, even without the Final Agency Decision, the jury heard testimony capable of supporting its finding that Warden Yusuff attempted to block Plaintiff's employment opportunities in retaliation for protected activity.  Former AW Joyce Caufil testified that she heard Warden Yusuff encourage Plaintiff to apply for a job, but then state outside of Plaintiff's presence that she would not voucher for Plaintiff and that Plaintiff had gone as far as she would go within the BOP.  Similarly, Mary Sonnier, the former Human Resources Manager for FCI Yazoo City, testified that Yusuff told her no one would take Minter-Smith because she was a troublemaker and "not loyal."  When asked why she encouraged Minter-Smith but then spoke poorly of her in private, Yusuff allegedly told Sonnier that it was just the way they had to "orchestrate things."  Sonnier also testified that Yusuff instructed her to keep a separate file for Minter-Smith's letters and emails.  No such files were kept for other employees.  Finally, Minter-Smith testified that she later asked Yusuff's replacement, Warden Michael Pettiford, whether there was hope for advancement, and the new warden allegedly told her, "Yusuff did a job on

you." Yusuff denied all of this during trial, but the testimony could support a reasonable conclusion that Yusuff, acting at times through others, orchestrated a retaliatory campaign against Minter-Smith.

Third, the evidence included four reference check forms that offer proof of a causal connection. These forms were prepared by the officials conducting the voucher interviews, and they document the substance of those conversations. Looking first at the forms for the two positions upon which Plaintiff prevailed at trial, the form for the General Training Instructor position indicates that an acting assistant warden at FCI Yazoo City provided the voucher. That interviewee gave Plaintiff the highest rating in five out of six categories. (Ex. P-20.) However, under the heading "Disciplinary Actions within last two years, if known," the form records, "Has had grievance filed." That notation is then marked out and replaced with "N/A." The next line of the form asks, "Would you employ the individual in this position?" The form is marked "No." It is hard to imagine a valid reason for anyone to mention Plaintiff's grievance in the context of a reference check, but having given Plaintiff such high marks in all areas, the jury could reasonably infer that the grievance motivated the negative recommendation. As for the Correctional Programs Administrator position, the interviewer spoke with AW Mitchell. A reasonable inference from Mitchell's testimony was that he gave Plaintiff lower scores during this voucher than he gave her in her performance reviews at FCI Yazoo City, and although he denied ever giving Minter-Smith a negative voucher, the jury could easily find that this voucher was negative. (Ex. P-21.)

The potential connection between Yusuff's alleged animus, her assistants, and the vouchers is further reflected in the reference check forms for the other two disputed positions.

6

For example, AW Mitchell vouchered for one of the positions and informed the interviewer that the "Warden is not supportive of this move."  (Ex. P-2.)  Mitchell confirmed at trial that Warden Yusuff instructed him to give this response.  Another voucher indicted that Minter-Smith should not be hired, and next to that entry is the notation, "Loyalty Problems."  (Ex. P-1.)  Given the evidence, the jury could easily conclude that the "loyalty" issues related to protected activity, and such a response on a voucher demonstrates retaliatory animus.  Moreover, this is the same terminology that several witnesses attributed to Warden Yusuff.  Although the jury, after finding retaliation, declined to find that "but for the retaliation she would have been selected" for these two positions, these two exhibits nonetheless offer strong proof of retaliatory animus, retaliatory conduct, and the connection between Yusuff and the assistants.

Of course, Warden Yusuff and the assistant wardens denied Minter-Smith's allegations at trial, and Defendant relies in part on their favorable testimony in the present motion.  Without exhaustively cataloging the substantial evidence, the Court generally notes that the testimony of the government's witnesses was at times internally inconsistent, contradicted their prior statements, and differed from the testimony of former BOP employees and Minter-Smith.  In fact, the Final Agency Decision expressly questioned the veracity of similar statements, noting that the accounts were "contradict[ory]," "somewhat disingenuous and . . . difficult to believe." (Ex. P-19 at 13.)  The Court finds that under the standards of Rule 50 or Rule 59, the record as a whole would allow a reasonable jury to conclude that Warden Yusuff acted in concert with her assistant wardens to block Plaintiff's employment opportunities for the two relevant positions.

Defendant next argues that Plaintiff failed to show she was the best qualified candidate and therefore would have been hired but for retaliation.  The Court finds, however, that credible

evidence supports the jury's verdict on causation as to both positions.  Starting with the Glynco General Training Instructor position, Plaintiff was listed among the best qualified.  Plus, the Final Agency Decision ruled in Plaintiff's favor on this claim and stated that the decision-maker "did not recommend complainant's name to the selecting official primarily because of the reference he received from FCI-Yazoo City."  (Ex. P-19.)  Also, Plaintiff's cross-examination of the decision-maker thoroughly reviewed the credentials of other applicants, comparing them to Minter-Smith's qualifications, and a reasonable jury could have concluded that Minter-Smith was "vastly-or even clearly–more qualified."  *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993). Finally, Defendant ultimately hired Plaintiff's subordinate for the position.

Regarding the Correctional Programs Administrator position, the Final Agency Decision ruled in Plaintiff's favor on this claim and stated that the decision-maker "did not select complainant for the Correctional Program Specialist position at the NCRO even though she had a similar background to the selectee because the selectee's vouchering was much better than complainant's."  (Ex. P-19 at 13.)  This finding is consistent with the decision-maker's trial testimony, and the evidence also included the credentials of the successful candidate.

In sum, the jury heard conflicting, credible evidence as to both of these hiring decisions. JMOL is not appropriate under Rule 50 because the Court cannot say that "the facts and inferences point so overwhelmingly to [the defendant] that reasonable jurors could not have arrived at a verdict except in [his] favor."  *Streber*, 221 F.3d at 721.  Moreover, a new trial must be denied under Rule 59 because the verdict was not "against the great weight of the evidence." *Dresser-Rand Co.*, 361 F.3d at 838-39.

8

B.    Constructive Discharge

Minter-Smith resigned her position at FCI Yazoo City; her employment was not terminated. "A resignation is actionable under Title VII, allowing the plaintiff to seek compensatory damages for events after the resignation, only if the resignation qualifies as a constructive discharge." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

In order to establish a claim for constructive discharge, "a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Id.* (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)).  In determining whether this standard has been met, courts have considered the following non-exclusive list of events:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Id.* (citations omitted).  Finally, "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim.  Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." *Id.* (citations omitted).

Defendant claims that Minter-Smith's evidence fails to establish a higher degree of harassment or that the working conditions were so intolerable that a reasonable person would feel compelled to resign.  Plaintiff responds by arguing that Defendant's retaliatory acts irrevocably damaged her chances for promotion within the BOP and that she suffered a series of unfavorable

job assignments at FCI Yazoo City, including a final assignment in which she was the only unit

manager asked to manage two units.

Considering the record as a whole, the Court will not disturb the jury's verdict. First, a

discriminatory failure to promote would be insufficient standing alone to establish constructive

discharge. In *Brown*, the Fifth Circuit affirmed a jury verdict of discriminatory failure to

promote, but it reversed the verdict on constructive discharge, finding that the discrimination

"*without more*, [was] insufficient for a finding that a reasonable employee in Brown's position

would have felt compelled to resign . . . ." *Id.* (emphasis added). The "without more" language,

though dicta, echos other, similar statements from the Fifth Circuit. For example, in *Jurgens v.*

*EEOC*, the court stated that "*without continuing harassment or repeated discriminatory*

*impediment* to any advance . . . dimmed future job prospects based upon the employer's past

discrimination in promotions are not alone enough to support a finding of constructive

discharge." 903 F.2d 386, 393 (5th Cir. 1990) (emphasis added) (citations omitted). Ultimately,

*Jurgens* held that the plaintiff's proof was speculative and insufficient with respect to her future

prospects. *Id.* In *Boze v. Branstetter*, the court held that "[a] failure to promote does not *in and*

*of itself* suffice to result in a constructive discharge." 912 F.2d 801, 805-06 (5th Cir. 1990)

(citing *Wardwell v. Sch. Bd. of Palm Beach County, Fla.*, 786 F.2d 1554, 1557 (11th Cir. 1986)

("[W]hile a discriminatory refusal to promote would be relevant to the issue of whether

[plaintiff] was constructively discharged, such evidence is not always sufficient to support a

finding of constructive discharge.")) (other citations omitted).

In this case, the failure to promote does not stand alone. First, this was not a single

incident of refusing to promote. The evidence supports an inference that Defendant orchestrated

a retaliatory campaign against Minter-Smith.  And, the comments attributed to Warden Pettiford suggest that the effects of the retaliation crippled Plaintiff's ability to seek other employment through the date of her resignation.  *See Jurgens*, 903 F.2d at 393.

Second, the alleged efforts to block Plaintiff's employment opportunities were coupled with a series of allegedly unfavorable job assignments.  Shortly after engaging in protected activity, Defendant moved Minter-Smith from one of the units to the prison camp.  Plaintiff claims that she was given one-day's notice.  The reasons for the move, the timing of the move, and the desirability of the new position were all disputed by the parties with credible evidence. In August 2002, Minter-Smith filed her EEO complaint.  Weeks later, in October 2002, Defendant moved Minter-Smith to the Employment Development Office ("EDO").  Plaintiff testified that in this position, she had no assigned job duties, no supervisory responsibilities, and performed menial tasks, such as copying.  The assigned duties were not seriously debated at trial, but the parties offered conflicting testimony regarding the factual predicates for the move, and who recommended the move.  The jury could have reasonably accepted either party's version of these events.

In November 2002, while assigned to the EDO, Plaintiff went to the emergency room experiencing chest pains and sweating, symptoms she claims were attributed to "severe stress." Minter-Smith did not return to work until January 2003.  On her first day back, she was told that AW Mitchell had recommended assigning her to "Unit 3" where she would have responsibility for both the "Upper" and "Lower" units.  In this capacity, Plaintiff claims that she oversaw approximately 700 inmates and supervised ten staff members.  Significantly, no other unit manager had ever been asked to supervise two units.  According to Minter-Smith, the stress of

11

this latest assignment led her to seek counseling in June 2003. By September, her counselor recommended an eight-week leave of absence that was later extended. Minter-Smith eventually decided to retire rather than return to work.

Looking first to the assignments that preceded the Unit 3 assignment, the Court finds that they are less relevant to this analysis. Although the stint at the EDO included some of the hallmarks of constructive discharge, Minter-Smith occupied the position for a very short period of time, and the Fifth Circuit has held that "both the permanence of the demotion and whether the demotion is a 'harbinger of dismissal,' are 'factor[s] to consider under the constructive discharge analysis.'" *McCann v. Litton Sys., Inc.*, 986 F.2d 946, 952 (5th Cir. 1993) (citations omitted). In addition, the move to the camp and the temporary assignment to the EDO occurred well before her final assignment and ultimate resignation, and a constructive discharge claim cannot be based on events that are remote in time. *Reznick v. Associated Orthopedics & Sports Med., P.A.*, 104 F. App'x 387, 393 (5th Cir. 2004) (citing *Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983)). However, these assignments are probative of the alleged pattern of retaliation that Plaintiff claims Defendant "orchestrated" up to and including her final assignment.

The final work assignment placed Plaintiff in a unique position at FCI Yazoo City. No other unit manager had previously been asked to supervise more than one unit. Although this move fails to invoke the most frequently cited factors for constructive discharge, those factors are not exclusive. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Significant to this case are those Fifth Circuit decisions identifying assignment to "more onerous duties" as among the additional "usual factors" of constructive discharge. *See McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993); *see also White v. Rush Health Sys., Inc.*, 85 F.3d 626,

12

1996 WL 255376, at *1 (5th Cir. 1996) (unpublished table decision) (noting "more onerous duties" as one of the "usual indicia of a constructive discharge").  Based on such cases, Plaintiff requested a jury instruction that included among the relevant factors, whether the Plaintiff's responsibilities were "more demanding than, other employees in the same job."  The instruction was given to the jury without objection from Defendant.

Having received such an instruction, the jury heard sufficient evidence that managing two units was more demanding than managing one.  Plaintiff described the stress related to this newly created position.  Her counselor confirmed that five months into her new job, Minter-Smith exhibited anxiety, depression, panic attacks, migraines, loss of sleep and a rash, all of which led the counselor to eventually recommend an eight-week leave of absence.[1]

As stated previously, this case turns on the credibility of the witnesses, and a reasonable jury could have rejected Plaintiff's evidence on this issue and accepted the evidence highlighted in Defendant's motion.  However, an equally reasonable interpretation is that after her protected activity, Defendant blocked Plaintiff's numerous attempts to transfer away from FCI Yazoo City (the effects of which lasted until she resigned), repeatedly moved her into various unfavorable positions for allegedly specious reasons, and saddled her with the unique and stressful responsibility of managing two units immediately after she returned from a stress-induced leave of absence.  A reasonable jury could conclude from all of this that Minter-Smith's working conditions were "so intolerable that a reasonable employee would feel compelled to resign."

---

[1]The Court is mindful of course that the appropriate test is whether "a reasonable employee would feel compelled to resign."  *Brown*, 237 F.3d at 566.

13

*Brown*, 237 F.3d at 566.  Defendant's motions for judgment as a matter of law, or alternatively, a

new trial, are therefore denied.[2]

       C.    <u>Remittitur</u>

       Defendant claims that the jury's $300,000 award for emotional distress was excessive and

unsupported by the evidence.  As an initial issue, Plaintiff claims that Defendant waived this

argument by failing to raise it in a motion for directed verdict.

> If a party fails to move for judgment as a matter of law under Federal Rule of
> Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that
> party waives both its right to file a renewed post-verdict Rule 50(b) motion and
> also its right to challenge the sufficiency of the evidence on that issue on appeal.

*Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 238 (5th Cir. 2001) (citing *Logal v.*

*United States*, 195 F.3d 229, 231 (5th Cir. 1999); *U.S. ex rel. Wallace v. Flintco Inc.*, 143 F.3d

955, 960 (5th Cir. 1998)).  The rule permits the "district court to re-examine the sufficiency of

the evidence after trial while, pre-verdict, the nonmovant is alerted to a potential insufficiency in

her case prior to its submission to the jury."  *Picou v. City of Jackson, Miss.*, 48 F. App'x 102,

2002 WL 31016468, at *2 (5th Cir. 2002) (unpublished table decision) (citing *MacArthur v.*

*Univ. of Tex. Health Ctr.*, 45 F.3d 890, 896-97 (5th Cir. 1995)).  "Where these purposes are

satisfied, technical noncompliance with Rule 50's requirements is permitted."  *Id*. (citing *Polonco*

*v. City of Austin, Tex.*, 78 F.3d 968, 975 (5th Cir. 1996)) (other citation omitted).

---

[2]Defendant argues that there is no basis for finding a constructive discharge after Warden
Yusuff retired.  However, the jury could have justifiably found, based on the record evidence,
that the effects of the "job" Yusuff allegedly did on Minter-Smith lasted beyond Yusuff's
employment.  In addition, AW Mitchell was still employed as Plaintiff's superior at FCI Yazoo
City and allegedly recommended her for the move to Unit 3.  The jury could have concluded, as
did the Department of Justice, that AW Mitchell had a retaliatory animus, as he provided
negative vouchers and was one of the focuses of the EEO investigation.

Defendant's post-trial motion at least suggests that emotional distress damages should be denied as a matter of law for lack of proof. Any such argument was available at the close of the evidence and has been waived. However, Defendant's reply to Plaintiff's waiver argument states that he does not challenge Plaintiff's right to recover emotional distress damages as a matter of law. Instead, Defendant challenges the amount awarded. Defendant could not have known whether the award was excessive until the jury rendered its verdict, and that issue has not been waived.

Turning to the amount, the jury awarded Minter-Smith $300,000 for emotional distress damages.[3] "There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) (citing *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985)). The decision to grant or deny a motion for remittitur rests in the sound discretion of the trial judge. *Id.*

Compensatory damages for emotional distress are not presumed from the mere violation of statutory rights, "but require specific individualized proof, including how [the] [p]laintiff was personally affected by the discriminatory conduct and the nature and extent of the harm." *DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) (citations omitted). Emotional harm may manifest itself, for example, as "sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, . . . a nervous

---

[3]Plaintiff claims in response that damages are recoverable for other injuries, such as damage to reputation. However, those injuries were not included in the jury instructions, and Plaintiff did not argue for their inclusion at trial.

breakdown[,] . . . ulcers, gastrointestinal disorders, hair loss, or headaches." *Id*. at 442-43

(quoting EEOC Policy Guidance No. 915.002 § II(A)(2) (July 14, 1992)); *see also Patterson v.*

*P.H.P. Healthcare Corp*., 90 F.3d 927, 938 (5th Cir. 1996).

"Judgments regarding noneconomic damages are notoriously variable." *Forsyth v. City*

*of Dallas, Tex*., 91 F.3d 769, 774 (5th Cir. 1996). Nevertheless, "[a] mainstay of the

excessiveness determination is comparison to awards for similar injuries." *Salinas v. O'Neill*,

286 F.3d 827, 830 (5th Cir. 2002) (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 589 (5th

Cir. 1985)). The Fifth Circuit Court of Appeals has adopted a "maximum recovery rule" by

which it remits "damage awards that [it] find[s] excessive to the maximum amount the jury could

have awarded." *Id*. The court has often "applied a multiplier, or percentage enhancement, to

past similar awards." *Id*. at 831. However, the court has also noted that it would not "apply a

multiplier where such a calculation was a part of the award" due to the inevitable growth in such

awards "resulting merely from the happenstance of there being several factually similar cases

with similar damages decided in close temporal proximity." *Id*.

Here, Plaintiff testified that Defendant's retaliatory conduct caused fatigue, stress,

headaches, anxiety, depression, sleeplessness, chest pains, humiliation, weight loss, panic

attacks, skin rashes, and marital problems. These symptoms are consistent with those addressed

in cases such as *DeCorte*, 497 F.3d at 442-43. Minter-Smith further testified that she saw her

family doctor for her stress, and the doctor saw fit to prescribe an anti-depressant (although

Minter-Smith refused to take the medication). Plaintiff also visited the emergency room on two

occasions with chest pains and later saw Laurie Petrie, a counselor, on six occasions. Petrie

testified at trial, informing the jury that Plaintiff appeared physically exhausted, cried, and

16

appeared depressed.  Petrie also recounted the same subjective complaints Minter-Smith conveyed to the jury, and the counselor recommended an eight-week leave of absence that she later extended.

The question is whether this evidence is sufficient to sustain a $300,000 judgement for emotional distress.  In *Salinas*, the plaintiff claimed symptoms similar to those claimed by Minter-Smith, including loss of self-esteem, feelings of not being a competent employee, loss of sleep, stress, paranoia, fear of future retaliation, and high blood pressure.  *Id*. at 829-30.  Salinas also claimed that the emotional harm affected his relationship with his wife.  *Id*. at 833.  Salinas visited doctors some seventy times and was awarded $16,000 in medical expenses.  *Id.* at 832-33.  The jury awarded $1 million in emotional distress, but that figure was lowered to the $300,000 statutory cap.  *Id.* at 829.  On appeal, the Fifth Circuit observed that "[h]urt feelings, anger and frustration are part of life . . . and [are] not the types of harm that could support a mental anguish award."  *Id*. at 832 (internal quotations and citation omitted).  However, "[d]amages for emotional distress may be appropriate . . . where the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation."  *Id*. (internal quotations and citation omitted).  Even viewed with deference to the jury and the trial court, the Fifth Circuit found an abuse of discretion and held that the maximum award would not exceed $100,000.  *Id.* at 833.  That amount was multiplied by 150%, rendering a $150,000 award for emotional distress.  *Id*.  The court concluded that anything more would be "clearly excessive."  *Id.* (citations omitted).

Other cases, including cases considered in *Salinas*, offer additional insight.  *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488-89 (5th Cir. 2001) (remitting $300,000 judgment and holding that jury could have awarded $100,000 for emotional distress when evidence demonstrated

17

sleeping trouble, headaches, marital difficulties, loss of prestige and social connections, depression, and discouragement, but multiplying by 150% in deference to verdict); *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486-87 (5th Cir. 2000) (upholding award of $100,000 in compensatory damages for emotional distress premised solely on plaintiff's testimony regarding her "severe emotional distress," "sleep loss," "severe loss of weight," and "beginning smoking"); *Forsyth*, 91 F.3d at 774 (upholding award of $100,000 premised solely on plaintiff's testimony that she consulted a psychologist and suffered "depression, weight loss, intestinal troubles, and marital problems").

This case is comparable to *Salinas*, *Giles*, *Forsyth*, and *Williams*, and is distinguishable from the cases cited by Minter-Smith and Defendant in their respective memoranda. First, the injuries are not equivalent to those in *Green v. Administrators of the Tulane Educational Fund* wherein the Fifth Circuit affirmed a $300,000 judgment for emotional distress. *See generally* 284 F.3d 642 (5th Cir. 2002). The plaintiff in *Green* presented testimony from a psychotherapist establishing "severe psychological effect[s]," " mood and anxiety disorders," and "suicidal ideation." *Id*. at 652, 656. In addition, the evidence established that the work-place harassment caused the plaintiff "to relive the trauma she had experienced during an earlier rape, which in turn brought on a relapse of Post-traumatic Stress Disorder." *Id*. Although Minter-Smith claims a longer period of distress, the severity falls well short of the facts in *Green*.

Conversely, the Court distinguishes *Migis v. Pearle Vision, Inc.*, a case Defendant relies upon. 135 F.3d 1041 (5th Cir. 1998). There, the plaintiff testified without corroboration that her termination was "a major inconvenience," causing "low self-esteem," and that "she suffered 'almost what I would call stress attacks or anxiety attacks,' marital hardship, and 'major stress,'

18

as well as 'lot[s] of crying, sleeplessness.'"  135 F.3d at 1046.  The trial court awarded $5,000 in

emotional distress damages, and the defendant appealed, claiming that she was not entitled to

recover.  *Id.* at 1045-46.  The Fifth Circuit affirmed, holding that the evidence was sufficient to

support an award for emotional distress.  *Id.* at 1047.  Unlike the present case, there is no

indication that the plaintiff in *Migis* ever consulted a physician, a counselor, or any other

healthcare provider.  Moreover, the Fifth Circuit was not asked to determine the maximum

award, and instead ruled that the plaintiff's testimony, standing alone, was sufficient to recover

emotional distress damages.  Defendant also cites *Vadie v. Mississippi State University*, which is

likewise distinguishable.  218 F.3d 365, 375-76 (5th Cir. 2000), *cert. denied*, 531 U.S. 1113,

*cert. denied*, 531 U.S. 1150 (2001).  In that case, the court held that a generic and uncorroborated

response to a single question regarding emotional distress was insufficient to recover more than

nominal damages.  Minter-Smith offered more than the plaintiff in *Vadie*.

In summary, the Court finds that the $300,000 verdict was excessive based on Fifth

Circuit precedence.  Plaintiff's claims are similar to those in *Forsyth* and *Williams*.  On paper,

Plaintiff's claims appear less severe than those in *Salinas*, but having viewed the testimony, the

Court finds that an award of $150,000 is appropriate.  *See Giles*, 245 F.3d at 487-88 (citing

*Patterson*, 90 F.3d at 937-38) ("[T]he harm is subjective and evaluating it depends considerably

on the demeanor of witnesses.").  Defendant's motion seeking new trial or, alternatively

remittitur, is therefore granted.

D.     Failure to Mitigate

Defendant finally claims that Minter-Smith failed to mitigate her economic damages. The Court heard testimony and received evidence on this point in a bifurcated proceeding.  As the finder of fact for this issue, this Court concluded that Plaintiff sufficiently mitigated her damages.  The Court denies this portion of Defendant's post-trial motion for the reasons previously stated on the record.

E.     Plaintiff's Motion for Attorneys' Fees

Under Title VII, the court "may allow the prevailing party . . . a reasonable attorney's fee . . . ."  42 U.S.C. § 2000e-5(k).  Minter-Smith prevailed and now seeks fees.  Defendant objects to the fees, contending that the rates and claimed hours are excessive.

When determining a statutory fee request, the first step is to calculate a "lodestar" amount "by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir. 1999).  "The court must then consider whether the lodestar should be adjusted, depending on the circumstances of the case and the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)."  *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008).

1.     *Lodestar*

The Court first determines the reasonable hours expended by scrutinizing the application. *Abrams v. Baylor Coll. of Med.*,  805 F.2d 528, 535-36 (5th Cir. 1986) (citing *Johnson*, 488 F.2d at 717).   "The trial judge should weigh the hours claimed against [the judge's] own knowledge, experience, and expertise of the time required to complete similar activities."  *Johnson*, 488 F.2d at 717.

Plaintiff submitted detailed billing records in support of her motion.  Those bills voluntarily wrote-off 124.7 hours of work, or 10.8%, through customary business judgment.  In addition, Plaintiff's motion anticipated Defendant's objections and therefore sought only ninety percent of the remaining time.  Finally, in reply to Defendant's detailed list of disputed time entries, Plaintiff withdrew another thirty-four entries and reiterated her willingness to cut the remaining hours by ten percent, rather than respond to each line-item Defendant challenged.

The Court has reviewed all of the objected-to entries and finds that most are acceptable.  First, Defendant objects to many of Plaintiff's entries as being too vague.  "As the Supreme Court noted in *Hensley* [*v. Eckerhart*], the Court does not expect counsel to record in 'great detail' how each minute of time was expended, but '*at least counsel should identify the general subject matter of his time expenditures.*'"  *Von Clark v. Butler*, 916 F.2d 255, 259 n.4 (5th Cir. 1990) (citing *Hensley*, 461 U.S. 424, 437 (1941)).  Although a few of the disputed entries in this case appear vague when read in isolation (*e.g.*, entry for communication with witness on October 3, 2003), the surrounding entries often provide the necessary context.  The Court finds that Plaintiff's time entries are sufficiently detailed and therefore distinguishable from the insufficient entries in cases such as *Von Clark*.  *Id.* at 259 n.6 (rejecting summaries of time records, including entries such as "telephone call," or "trial preparation," "without any identification whatsoever of the subject matter").

The Court also rejects Defendant's argument that certain expenses were unnecessary.  Plaintiff does not seek reimbursement for all time incurred.  For example, she voluntarily excluded time spent researching issues that were not pursued.  The research that was included in her fee request was reasonable and necessary given the motion practice that transpired.

21

Similarly, the fact-finding efforts for which she seeks compensation, including interviews and review of depositions, statements, discovery, and the like, were reasonable and necessary.

Defendant further objects that many of the entries are clerical in nature. "[T]he Court should consider whether the work performed was 'legal work in the strict sense' or was merely clerical work that happened to be performed by a lawyer." *Abrams*, 805 F.2d at 536 (citing *Johnson*, 488 F.2d at 717). The Court agrees that the following entries could be disallowed as non-legal, clerical work:

| Date | Time-keeper | Time | Summary of Entry |
|------|-------------|------|------------------|
| 9/9/2003 | AJP[4] | 0.20 | Preparation of letter to Capitol Process Service regarding service of Complaint and Summons on John Ashcraft and Federal Bureau of Prisons |
| 9/9/2003 | AJP | 0.30 | Preparation of letter to Atty. Murrell regarding Pro Hac Motions and status of Complaint service |
| 9/12/2003 | AJP | 0.20 | Preparation of letter to Atty. Murrell regarding status of service and enclosing Return of Service on Federal Bureau of Prisons |
| 12/3/2003 | AJP | 0.10 | Conduct Internet search to obtain information regarding US Attorney in Mississippi |
| 9/22/2004 | VAS | 0.10 | Telephone conference with Clerk's office to verify that extension for expert designation was given. |
| 10/7/2004 | VAS | 0.70 | Search for correct address for MEA Cares and draft letter to MEA Cares to request medical records. |
| 10/7/2004 | VAS | 0.30 | Draft medical release cover letter for Dr. Burnett. |
| 10/28/2004 | VAS | 0.30 | Draft correspondence to Laurie Petre to get her vitae. |

---

[4]"AJP" is a paralegal. Defendant did not object to the inclusion of paralegal time, but did object when the time spent was not spent on legal matters and was instead clerical.

| 11/4/2004 | AJP | 1.00 | Review client documents and assist in locating documents for V. Singleton to use as exhibits to motion.[5] |
|-----------|-----|------|---|
| 11/16/2004 | VAS | 0.30 | Search for telephone number for Nissan facility in Canton, Miss to reach former Yazoo City FCI employee. |
| 11/23/2004 | BLC | 0.10 | Telephone conference with FCI regarding status of medical records |
| 11/24/2004 | BLC | 0.30 | Telephone conference with FIC for address for service of subpoena; Prepare letter to process server transmitting Pearson subpoena; Prepare letter to process server transmitting Yusuff subpoena |
| 11/24/2004 | VAS | 0.10 | Telephone conference with Shirley Minter-Smith regarding changing the time of her deposition. |
| 12/13/2004 | VAS | 2.40 | Check medical records in file and in client documents and compare to medical records sent to Defendant to make sure all documents received have been sent and to determine which medical records are outstanding. |
| 3/18/2005 | VAS | 0.20 | Draft and send e-mail to defense attorney regarding dates E. Siegel and V. Singleton are available to meet and confer prior to the pretrial conference.[6] |

Defendant also claims that a large number of entries are duplicative or excessive. *See Abrams*, 805 F.2d at 536 (citing *Johnson*, 488 F.2d at 717) (noting the court must review the records for "evidence of duplication of effort"). The Court has reviewed each challenged entry and finds that the vast majority are acceptable. Some overlap certainly occurred (*e.g.*, on September 30, 2004, two attorneys billed for a conference). However, the use of associates and

---

[5]Plaintiff voluntarily withdrew one of the two entries on this date, but it is not clear which one (entries appear for 0.70 and 1.30 hours).

[6]The entries in this chart appear as they did in the billing records submitted by Plaintiff.

other behind-the-scenes assistants did not cause excessive overlap and allowed the work to be performed at a lower hourly rate.  Plus, Plaintiff ran a lean operation and avoided considerable fees by using only one attorney at trial and during other hearings–Defendant was represented by four attorneys at every proceeding.

When the Court adds the few entries it might be inclined to strike for overlap and excessiveness to the clerical reductions listed above, the amount is still less than the ten percent across the board cut Plaintiff offered.  Accordingly, having considered, but rejected, Defendant's remaining arguments, the Court finds that Plaintiff's fees should be paid based on the submitted time (after all voluntary reductions).

The Court must next determine the appropriate hourly rate.  "Reasonable hourly rates are determined by looking to the prevailing market rates in the relevant legal community."  *Green*, 284 F.3d at 662 (citation omitted); *see also Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993) (applying rate that had been used in the community for similar cases).  The "relevant market for purposes of determining the prevailing rate to be paid in a fee award is the community in which the district court sits . . . ."  *Scham v. Dist. Courts Trying Criminal Cases*, 148 F.3d 554, 558 (5th Cir. 1998).  "Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there."  *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).  "The court should also bear in mind that the fee applicant bears the burden of documenting the appropriate hours expended and hourly rates."  *Abrams*, 805 F.2d at 535-36 (citing *Hensley*, 461 U.S. at 434-35).  "Where the documentation is inadequate, the [d]istrict [c]ourt has discretion to reduce the award accordingly."  *Id*.

In this case, Plaintiff seeks the prevailing market rates for Washington, D.C., claiming that she was unable to locate competent counsel in the Southern District of Mississippi. The Court cannot accept this argument. Although Mr. Siegel performed admirably, this Court has observed local attorneys with at least equal experience, reputation, and ability in this area of the law and sees no reason to award a rate greater than the prevailing rate in this legal community.

As for the customary fee in this legal community, both parties submitted, at the Court's request, affidavits from well-known, local attorneys practicing in this field. Plaintiff's affiant declared that prevailing hourly rates are as follows: $280 for experienced lead counsel; $175 for mid-level associates; and $165 for new lawyers. Defendant observed in response that just two years ago, a time period that overlaps a portion of this fee request, Plaintiff's affiant submitted an affidavit seeking $200 per hour for lead counsel and $150 per hour for a new associate.

Defendant presented the affidavit of Jim Wade, another Mississippi employment lawyer, who stated that "prevailing hourly rates for attorneys who practice in this area are from $150.00 to $300.00 per hour. The rate approved for me by the court has been $150.00 to $200.00 per hour over the last 2 - 3 years." Mr. Wade concluded that "the above hourly rates are reasonable hourly rates." Although Mr. Wade works out of Tupelo, Mississippi, he is well-known to this Court and frequently represents clients across the state. Mr. Wade's years of experience double those of lead counsel, he has argued before the United States Supreme Court, and he is listed as counsel in approximately fifty opinions from the Fifth Circuit Court of Appeals. The Court finds that the fees customarily awarded to Mr. Wade, which reflect the fees sought in other litigation by Plaintiff's affiant, are reasonable in this instance.

25

Defendant also claims that Plaintiff's rate for travel time should be reduced by half. *See generally Hopwood v. Texas*, 236 F.3d 256 (5th Cir. 2000) (affirming fifty percent reduction in travel time). Here, Plaintiff withdrew much of the requested travel time for an associate attorney and otherwise agreed to cut lead counsel's hourly rate to $125. Lead counsel also represented to the Court that he, at times, worked while in transit. Travel time is customarily reimbursable in this legal community, and the Court finds that the $125 per hour rate Plaintiff seeks for lead counsel is reasonable and more than consistent with local practice. The associate's travel time will be billed at $100 per hour.

Accordingly, Plaintiff is entitled to recover the following fees under the lodestar analysis:

| Time-Keeper | Rate | Time Sought | Fee |
|---|---|---|---|
| Eric L. Siegel | $200 | 439.1 | $ 87,820.00 |
| | $125 | 53.7 | $6,712.50 |
| Eric L. Siegal Supplement | $200 | 37.3[7] | $ 7,460.00 |
| Colleen Leyrer | $175 | 58.5 | $ 10,237.50 |
| Vivian Singleton | $150 | 486.5 | $ 72,975.00 |
| | $100 | 15.2 | $ 1,520.00 |
| Josh Burton | $175 | 1.6 | $ 280.00 |
| Kirsten Doolittle | $175 | 12.5 | $ 2,187.50 |
| Sergio Oehninger | $90[8] | 2.2 | $ 198.00 |

---

[7]Plaintiff submitted an invoice covering post-trial motions. The entries in the invoice are sufficiently detailed, relate to pure legal work, and reflect a reasonable amount of time spent on the activities.

[8]Plaintiff typically charges $245 per hour for this time-keeper, but requested ninety dollars per hour for legal research.

26

| Law clerks/paralegals | $75 | 12.2 | $    915.00 |
|---|---|---|---|
| **Subtotal** | | | **$190,305.50** |
| (-10%) | | | $ 19,030.55 |
| **Grand Total** | | | **$171,274.95** |

2.    *Johnson Factors*

Having determined that the lodestar amount is $171,274.95, the Court must now consider

whether that amount should be increased or decreased based on the *Johnson* factors, to wit:

> (1) the time and labor required for the litigation; (2) the novelty and difficulty of
> the questions presented;  (3) the skill required to perform the legal services
> properly; (4) the preclusion of other employment by the attorney due to
> acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or
> contingent; (7) time limitations imposed by the client or the circumstances; (8) the
> amount involved and the result obtained; (9) the experience, reputation and ability
> of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of
> the professional relationship with the client; and (12) awards in similar cases.

*Migis*, 135 F.3d at 1047 (citing *Johnson*, 488 F.2d at 717-19).

The Court must "explain with a reasonable degree of specificity the findings and reasons

upon which the award is based, including an indication of how each of the *Johnson* factors was

applied." *Von Clark*, 916 F.2d at 258.  However, the Fifth Circuit Court of Appeals has

narrowed the scope of this review.  The trial court must be careful "not to double count a

*Johnson* factor already considered in calculating the lodestar when it determines the necessary

adjustments." *Shipes*, 987 F.2d at 320 (citing *Von Clark*, 916 F.2d at 258); *see also Migis*, 135

F.3d at 1047.  "Four of the *Johnson* factors-the novelty and complexity of the issues, the special

skill and experience of counsel, the quality of representation, and the results obtained from the

litigation-are presumably fully reflected in the lodestar amount." *Shipes*, 987 F.2d at 320

(citation omitted).  In addition, whether the fee is fixed or contingent (factor six) is no longer a

27

proper consideration. *See Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761, 772 (5th

Cir. 1996) (citing *City of Burlington v. Dague*, 505 U.S. 557, 567(1992)).

In the present case, the Court's lodestar calculation already considers the time and labor

required; the customary fee; and the experience, reputation, and ability of counsel.  The Court

finds no basis for separately considering the *Johnson* factors found to be "reflected" in the

lodestar analysis.  *Shipes*, 987 F.2d at 320.  "Although upward adjustments of the lodestar figure

based on these factors are still permissible, such modifications are proper only in certain rare and

exceptional cases supported by both specific evidence on the record and detailed findings by the

lower courts."  *Id*.  There is nothing rare or exceptional about this Title VII case.  Plaintiff's

claims were typical for a Title VII litigant.  There were only two parties and two general legal

issues, and the case was tried in one week.  Certainly, Title VII cases present unique challenges,

but they are reflected in the hourly rate calculation.  The matter does not call for an enhancement

of the standard rate in this field.  *See id.* at 321.

As for the result, it was certainly favorable.  However, the recovery was limited to a

single plaintiff and will have no impact beyond these litigants.  *See id.* at 322 (holding that

enhancement "may have been warranted" when "the victory resulted in a substantial award of

monetary damages for class members-plus, and very importantly, future protection against

discrimination in the form of injunctive relief").

Plaintiff also argues for an enhancement due to the preclusion of other employment.

*Johnson*, 488 F.2d at 718.  Again, the Court does not find that an enhancement is justified on this

basis.  The trial of this matter lasted one week, and motion practice was commensurate with other

Title VII cases.  While counsel claims to have turned away potential clients, there is nothing

28

before the Court identifying or quantifying the lost work, and there is nothing about this case that should have prevented other representation.

Plaintiff also claims that the litigation was undesirable.  However, the case was no more undesirable than any other employment case in this venue, a fact the Court considered when determining the prevailing local rate.  Finally, the remaining *Johnson* factors, "special time limits imposed" and "nature and length of the professional relationship," are neither contested nor relevant.  Thus, having fully considered the *Johnson* factors, the Court sees no basis for increasing or decreasing the lodestar rate.

F.      Plaintiff's Motion for Costs

Title VII allows recovery of "'reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services'. . . ." *Mota v. Univ. of Tex. Health Sci. Ctr.*, 261 F.3d 512, 529 (5th Cir. 2001) (citation omitted).  The party moving for attorneys' fees carries the burden of proving its request for costs with documentation of the costs incurred and evidence that a specific item was "necessarily obtained for use in the case."  *Fogelman v. Aramco (Arabian Am. Oil Co.)*, 920 F.2d 278, 285-86 (5th Cir. 1991).  Here, Plaintiff seeks $27,281.95 in costs.  Defendant generally consents, but seeks reduction for $2,534.00 paid to local counsel and $4,592.97 paid for Westlaw, on-line legal research.

Starting with local counsel, the Court has discretion to award attorneys' fees as costs under 42 U.S.C. §2000e-5(k).  That Plaintiff seeks these fees as a cost separate from her fee request does not alter her burden of demonstrating "the appropriate hours expended and hourly rates."  *Abrams*, 805 F.2d at 535-36 (citing *Hensley*, 461 U.S. at 434-35).  "Part of the applicant's

29

ability to meet his burden includes maintaining billing time records . . . ."  *Von Clark*, 916 F.2d at

259 (citing *Hensley*, 461 U.S. at 437).  Additionally, "'counsel should [at least] identify the

general subject matter of his time expenditures.'"  *Id.* at 259 n.4 (quoting *Hensley*, 461 U.S. at

437 n.12).  When the documentation is inadequate, the Court may reduce the fee request.  *Id.* at

259 (affirming reduced figure based on the court's "experience and observations of the

proceedings"); *see also Abrams*, 805 F.2d at 535-36 (noting that court may reduce an

unsupported fee request).

  In this case, local counsel presented no billing records, no hourly rate information, and no

indication of the services rendered.  The only evidence of these fees is reflected in lead counsel's

affidavit statement that they were paid for "filing the complaint and sporadic assistance."  Ex. C

to Plaintiff's Motion for Attorneys' Fees and Costs ("Plaintiff's Motion") at ¶ 15.  The detailed

time records from Plaintiff's lead counsel offer little additional insight, and the itemized

expenses include only one payment to local counsel in the amount of $540.00.  Absent some

indication as to what was done, how much time was spent, and the other factors this Court must

consider, the Court reduces the cost to $540.  *See Von Clark*, 916 F.2d at 259 n.6.

  Plaintiff's Westlaw charges are compensable, despite the holding by at least one district

court within the Fifth Circuit that such expenses are "more akin to overhead costs."  *See Migis v.*

*Pearle Vision, Inc*., 944 F. Supp. 508, 518 (N.D. Tex. 1996).  The question is whether counsel

would normally pass these charges to a fee-paying client.  42 U.S.C. §2000e-5(k); *see also Mota*,

261 F.3d at 529.  Here, Plaintiff has submitted (1) an affidavit stating that her attorneys bill such

items to the client, Ex. C to Plaintiff's Motion at ¶ 15; (2) invoices including these expenses, Ex.

B to Plaintiff's Motion; and (3) the engagement letter agreeing that these fees will be billed as

costs to the client, Ex. D to Plaintiff's Motion.  There is no proof to the contrary in the record, and the Westlaw charges will be charged to Defendant.  *See, e.g., InvesSys, Inc. v. McGraw-Hill Co.*, 369 F.3d 16, 22 (1st Cir. 2004); *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 261 F. Supp. 2d 626, 635-36 (N.D. Miss. 2003).

## III.    Conclusion

For the above stated reasons, the Court holds as follows.  Defendant's motion for judgment as a matter of law [172] and motion for a new trial [173] are denied.  Defendant's motion for remittitur [174] is granted, and Plaintiff is therefore given the option of retrying the issue of non-compensatory damages or accepting an award of $150,000.  Finally, the Court grants Plaintiff's motion for attorney's fees and costs [178] and awards fees in the amount of $171,274.95 and costs totaling $25,287.95.

**SO ORDERED AND ADJUDGED** this the 22th day of May, 2008.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE